### Drake, et al. v. Black Diamond Coal Mining Company.

(Decided January 22, 1926.)

### Appeal from Muhlenberg Circuit Court.

1. Mines and Minerals—Abandonment of Coal Lease Rests Partly on Intention.—Abandonment of coal lease rests in part on intention.
2. Mines and Minerals—Lessee Held Not to Have Abandoned Lease by Removing Machinery from Opening on Leased Land to Shaft on Adjoining Land.—Coal mining company held not to have abandoned lease by removing its machinery and coal tipple from opening on lessors' property to shaft on adjoining land owned by it for purpose of mining unexhausted seam under lessors' land, after encountering fault which prevented further mining thereof through any opening on field stipulated in lease.
3. Mines and Minerals—Coal Lease Held Not Terminated by Operation of Law Because no More Coal Could be Commercially Mined Through Any Opening in Certain Field.—Coal mining lease held not to have terminated by operation of law because no more coal could be commercially mined through any opening in certain field, though lease forbade making of openings elsewhere in lessors' property, where certain seam could be commercially mined through entry from shaft on adjoining land owned by lessee.
4. Mines and Minerals—Coal Lease Held Not Forfeited by Failure to Pay Royalties Since Last Coal Was Mined.—Coal lease, providing for application of royalties paid above minimum guaranty in any year to deficiencies in succeeding years, held not forfeited by failure to pay royalties since last coal was mined, where lessee had paid more than minimum guaranty over entire period of lease, and was making efforts to mine unexhausted seam.

GORDON, GORDON & MOORE for appellants.

WILLIS & TAYLOR for appellee.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

By lease dated December 27, 1887, John R. Drake and Honora Drake, his wife, leased to the predecessors in

title of the appellee, Black Diamond Coal Mining Company, a certain tract of land now in Drakesboro, Kentucky, for coal mining purposes. By mesne assignments this lease has come into the ownership of the appellee. John R. Drake died January 31, 1917, and the appellants, his devisees, brought this action in July, 1923, against the appellee to have this lease declared abandoned, forfeited, and terminated by operation of law, and to have their title to the property covered by it quieted. From a judgment dismissing their petition they bring this appeal.

The decision of the key question involved in this litigation turns on the construction to be placed on the lease of December 27, 1887. The material parts of that lease applicable to such decision are:

"Witnesseth: That said parties of the first part for consideration hereinabove (*sic*) named have granted, let and leased and by these presents do grant, let and lease unto the parties of the second part for and during the term of fifty years, commencing with this date, the exclusive right and privilege to mine, take out, sell and convert to their own use any and all coal in or under a certain tract of land. (Here follows the description, comprising just short of 200 acres.) . . .

"The said parties of the second part shall also have the right to use without let or hindrance during the term of this lease, fifty years, any and all entries, roadways, etc., which they may make through said land, that is under the surface, which they may desire to use in mining any coal other than the coal under the said tract, and also to use for such purpose any and all tramways, tipples, switches, and other improvements and appliances which they may place in or upon said land, and the said parties of the second part shall have the use of the open ground or old field adjoining and west of the depot for machinery, tipples, tramway, switches, storehouse, warehouses, stables, barns and dwelling houses, or other improvements necessary to be made upon said land in mining the coal, and they shall also have the right to dump the debris from the mine upon said land.

"The said parties of the second part in consideration of this lease do agree and bind themselves as follows: First, to commence operations upon said land by the first day of June, 1888, and to mine dur-

ing the twelve months next thereafter ensuing ten thousand (10,000) tons of coal and during each succeeding twelve months after the first twelve months unless providentially hindered to mine twenty thousand (20,000) tons of coal during the continuance of this lease or until the workable coal of veins No. 11 and No. 9 under said land are exhausted, if that should occur sooner. . . . Second, to pay to said parties of the first part a royalty of three cents per ton . . . . to be paid monthly. . . . If the said parties of the second part should at any time in compliance with their guarantee as to output pay for more coal than they had mined such excess of payment shall be deducted from the first excess of output over amount guaranteed that may occur at said mines, and if they should at any time mine and pay for more coal than the amount guaranteed such excess shall be added to the first shortage of output that may occur. . . .

"It is agreed that no openings except for air shafts and drainage shall be made upon any part of said land except the old field lying just west of the railroad, which old field embraces some fifteen or sixteen acres. . . .

"To have and to hold the lands above described subject to the exceptions hereinbefore named unto the parties of the second part, their heirs and assigns for the purpose above mentioned, for and during the term aforesaid, fifty years."

From the evidence it appears that the predecessor in title of appellee on the execution of this lease at once entered upon the development of the property in question. It sunk a shaft and began the mining of the No. 11 seam. It was not long, however, before a fault was encountered, which, as is conceded by all the parties to this litigation, prevented and still prevents the further mining of the No. 11 seam through any opening which can be made on the "old field of sixteen acres," this being the only part of the surface in which appellee has any right under its lease to make an opening. After this fault was encountered appellee's predecessor sunk the shaft down to the No. 9 seam, which it and its assignees, including appellee, have continued to mine up to August, 1922, by which time, as is agreed, all of the No. 9 seam under the leased property had been exhausted. During this period

appellee and its predecessors have paid the appellants and their ancestor $30,187.38 in royalties, which sum amounts to more than the guaranteed minimum royalty for the full period of the fifty years of the lease. When the appellee ceased mining the No. 9 seam in August, 1922, it was then developing a coal mine on property it owned adjoining the leased premises here in question. It had sunk a shaft known as the No. 2 shaft and was engaged in sinking a shaft known as the No. 3 shaft. This shaft tapped the No. 11 seam of coal in this district, and on the other side of the fault encountered on the appellants' property. It was and is the purpose of appellee to mine the No. 11 seam of coal on appellants' property from an entry driven from this No. 3 shaft, and at the time this litigation was instituted, it had driven this entry some five hundred feet towards appellants' property and to a point within sixteen hundred feet of the No. 11 seam therein.

The evidence utterly fails to show any abandonment by appellee of this lease. Abandonment rests in part upon intention. 1 C. J. 6. The appellee never intended to relinquish whatever rights it had under this lease, but on the contrary has gone forward with the development of the property in a way which it claims to have the right to do. It is true appellee undertook until it was enjoined by a temporary injunction in this case to remove its machinery and coal tipple from the old opening on appellants' property to this No. 3 shaft, and it is also true that it did do so after the lower court dissolved this injunction, but the purpose of this removal was not to abandon the development of appellants' property but to further it through the No. 3 shaft above mentioned. There being no abandonment, was the lease forfeited or terminated by operation of law? Appellants insist that it was because, first, no more coal could be commercially mined through any opening in the ''old field of sixteen acres,'' and as the coal was thus exhausted, the lease was terminated by operation of law since its purpose had been fully accomplished; secondly, as appellee had not paid any royalties since the last coal had been mined in August, 1922, the lease had become forfeited.

Whether or not the lease had terminated by operation of law turns on the right of appellee to mine the No. 11 seam of coal on appellants' property through an entry driven from the No. 3 shaft. Appellants say that

appellee, under its lease, cannot mine such coal except through openings in the "old field of sixteen acres." The quoted portions of the lease, which are all of it that bear on this aspect of the controversy, do not in terms require appellee to mine the coal on appellants' land through openings in the old field. It is true that they do forbid the making of any openings in appellants' property except in the old field; but if appellee is able to mine this coal from its adjoining property and without making any openings at all on appellants' property, we fail to see where such action on its part is prohibited or forbidden expressly or impliedly by this lease. The purpose of the lease is to have appellee mine all the coal, both the No. 9 and the No. 11 seams, which may be found on the property and it is immaterial to the parties how this may be mined, provided no openings are made on the property, if any are made, except in the old field. To us this appears the obvious common sense of the matter, and that it is so is seen from the text in 18 R. C. L. 1191, which reads:

"*Prima facie* and in the absence of express provisions to the contrary in a lease of mines, the lessee is not bound to work by a pit or a shaft sunk in the land of the lessor but may get the minerals if he can by instroke through the shaft of a mine on adjoining lands."

Although it is conceded that the No. 11 seam cannot be practically mined from any opening in the old field it is not seriously contended that it cannot be commercially mined through the entry driven from the No. 3 shaft, and as the No. 11 seam on appellants' property has not been exhausted, and as appellee has not abandoned its lease nor ceased its diligent efforts to reach this No. 11 seam, it cannot be said that this lease has terminated by operation of law, conceding that it should be construed as one for fifty years or so long as coal may be found in paying quantities, a question which we do not now decide.

So far as the claimed forfeiture is concerned, the lease itself provided that any excess of royalties above the minimum guarantee in any one year should be applied to any deficiencies in any succeeding year or years. As the appellee has paid enough royalties to equal the minimum guarantee over the entire period of the lease, it is apparent that at least so long as the appellee is making the efforts it is to mine the No. 11 seam, its failure

to pay royalties from August, 1922, until it can get out this No. 11 coal, providing this be within the fifty-year period, does not afford any ground to forfeit the lease.

These views being in accord with the views of the lower court, its judgment is affirmed.